UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

**FILED**

JUL 3 0 2003

CLERK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| JAMES G. ABOUREZK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| PROBUSH.COM, INC., a Pennsylvania | ) |
| corporation, and MICHAEL MARINO, | ) |
| an individual, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Civ. No. 03-4146

**DEFENDANT PROBUSH.COM, INC.'S
BRIEF IN SUPPORT OF ITS
RULE 12(b)(6) MOTION TO DISMISS**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Defendant ProBush.com, Inc. has filed a motion to dismiss the Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (failure to state a claim upon which relief can be granted). The Defendant now respectfully submits its brief in support of its motion. The motion is further supported by the Affidavit of Michael Marino, filed in his capacity as President of ProBush.com, Inc.

## BACKGROUND

### Senator Abourezk

Plaintiff James G. Abourezk is "an honorably discharged veteran of the United States Navy, a former United States Congressman, and a former [United States] Senator" for the State of South Dakota. *See* Plaintiff's Complaint, ¶10. In addition, "Mr. Abourezk has had a long and distinguished career as an amateur and professional photographer as well as an author. His photographs have appeared in the *Washington Post* and other publications. He has also authored two

books, 'Through Different Eyes,' co-authored with Hymen Bookbinder, and 'Advise and Dissent.'"[1]

### ProBush.com

Defendant ProBush.com, Inc. is a Pennsylvania corporation with its principal place of business in West Point, Pennsylvania. *See* Plaintiff's Complaint at ¶2. ProBush.com, Inc. publishes an internet website under the domain name ProBush.com. *See id.* at ¶6.

True to its name, the ProBush.com website expresses and encourages support for President George W. Bush. The initial page of the website contains a photograph of the President emblazoned with the headings "President of the United States" and "George Walker Bush."[2] Below the image are three captions labeled "Our Hero," "Hail to the Chief," and "Support Our Troops." *See id.* The "Our Hero" caption links to a page that displays free Iraqi citizens expressing gratitude to the United States and President Bush for the liberation of Iraq. The "Hail to the Chief" caption links to a page that displays a photograph of President Bush with an American flag in the background. The "Support Our Troops" caption links to a page that itself links to websites for various military support and relief organizations, such as the USO and the American Red Cross, and encourages visitors to participate in or provide financial support for those organizations. The website also provides links to various other web pages, news stories, and opinion pieces that are generally supportive of

---

[1] Verified Complaint of James G. Abourezk, *Abourezk v. The National Geographic Society*, CIV. 02-4179 (D.S.D. May 20, 2002). *See Stahl v. USDA*, 327 F.3d 697, 700 (8th Cir. 2003) ("The district court may take judicial notice of public records and may thus consider them on a motion to dismiss").

[2] Affidavit of Michael Marino, Ex. A. *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (holding that, for purposes of ruling on 12(b)(6) motion to dismiss, district court could properly rely on materials referred to in or necessarily embraced by the pleadings); *Knievel v. ESPN, Inc.*, 223 F.Supp.2d 1173, 1176 (D.Mont. 2002) (holding that in defamation action premised upon statements on website, district court could properly consider entire contents of website when ruling on 12(b)(6) motion to dismiss).

President Bush, his Administration, and the United States military. In addition, the website advertises "ProBush.com" apparel, posters, and other items. At the top of the home page, above the photograph of President Bush, is a list of links to various other pages included on the website, two of which are labeled "Patriot List ™" and "Traitor List ™." *See* Marino Aff., Ex. A.

### The "Patriot List"

The "Patriot List" begins with what appears to be a dictionary definition of the term: "PATRIOT, n. One who loves his country, and zealously supports its authority." Marino Aff., Ex. B. It then states "IF YOU DO SUPPORT OUR PRESIDENTS [sic] DECISIONS YOU ARE A PATRIOT TO OUR COUNTRY!" The list that appears below consists of two categories. The first category of "Patriots" are individuals from around the country who have apparently accepted the site's invitation that states: "If you wish to become an Official ProBush.com Patriot please email your full name, age and state to PatriotList@probush.com." The second category is made up of what are termed "Honorary Patriots," and includes the names and photographs of Bruce Willis, Dennis Miller, Bill O'Reilly, Clint Black, Tippi Hedren, Rush Limbaugh, and other Hollywood celebrities, musicians, political commentators, and public figures who presumably support President Bush. At the bottom, this page provides a mechanism by which a visitor to the site can "Add an Honorary Patriot."

### The "Traitor List"

Upon opening the "Traitor List," the website plays an audio clip stating, "You're the traitor." The clip is from the motion picture *The Man in the Iron Mask* (Metro-Goldwyn-Mayer, 1998), based on Alexandre Dumas's 1846 novel of the same name. The "Traitor List" also begins with what appears to be a dictionary definition of the word "treason," stating: "Treason: Violation of allegiance toward one's country or sovereign, especially the betrayal of one's country by waging war

-3-

against it or by consciously and purposely acting to aid its enemies." Marino Aff., Ex. C. It then

provides the website's definition of a "Traitor" for purposes of its "Traitor List," stating: "Traitor:

If you do not support our President's decisions you are a traitor." Next, the sentence "Get to know

your traitor!" appears. The website also states: "*Parody. Not to be taken seriously. These 'traitors'

are not legal 'traitors' of the United States."[3]

The "Traitor List" is comprised of the names and photographs of movie stars, musicians,

politicians, and other public figures (many of them famous signatories of the celebrated "Not in Our

Name" anti-Iraq war petition published worldwide), who presumably do not support President Bush

or his decision to authorize military action in Iraq. There are well over one hundred names on the

"Traitor List," including Barbra Streisand, Susan Sarandon, Martin Sheen, Jane Fonda, Janeane

Garofalo, Sean Penn, Madonna, Whoopi Goldberg, President Jimmy Carter, Vice-President Al Gore,

Senator Ted Kennedy, Senator Hillary Clinton, House Minority Leader Nancy Pelosi, Oliver Stone,

Peter Arnett, Michael Moore, Edward Asner, Noam Chomsky, Bonnie Raitt, Casey Kasem, and the

country music band, "The Dixie Chicks." In addition, some individuals who visit the website

apparently send in a picture and request to be placed on the list. Somewhere in the middle of the

list, five or six places down from Vice-President Gore and Senator Clinton, and two places up from

"Patch Adams," Senator Abourezk's name is listed and his photograph appears. The photograph

appears to have been taken at a public speech by Senator Abourezk, as he is standing at a rostrum

and a banner, apparently designating the sponsoring group, hangs in the background.

---

[3]At the time that the Plaintiff's complaint was filed, this disclaimer appeared at the
bottom, rather than the top, of the "Traitor List." *See* Affidavit of Michael Marino, ¶11. A
previous version of this sentence appearing on the website included the additional phrase,
"though we wish they were." *See id.*

## STANDARD OF REVIEW

When considering a motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6), it is assumed that all facts alleged in the complaint are true. *See Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir. 1994). A complaint may not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts demonstrating that he is entitled to relief. *See Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir. 1998); *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990) (holding that threshold constitutional inquiry in defamation cases is whether statement is "sufficiently factual to be susceptible of being proved true or false"); *Dodds v. American Broadcasting Co., Inc.*, 145 F.3d 1053, 1065 (9th Cir. 1998) (explaining that a court may properly determine whether a statement is fairly susceptible of defamatory meaning on motion to dismiss for failure to state a claim); *Weyrich v. The New Republic, Inc.*, 235 F.3d 617, 624 (D.D.C. 2001) (same).

On a Rule 12(b)(6) motion to dismiss, the district court may consider, in addition to the pleadings, any materials embraced by the pleadings, as well as materials that are part of the public record. *See In re K-Tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 889 (8th Cir. 2002); *Silver v. H&R Block*, 105 F.3d 394, 397 (8th Cir. 1997); *Knievel*, 223 F.Supp.2d at 1176 (holding that in defamation action premised upon website statements, district court properly considered entire contents of website on 12(b)(6) motion). If additional matters outside the pleadings are considered, the court must convert the motion to dismiss into one for summary judgment. *See Stahl*, 327 F.3d at 701. "However, '[t]he court has complete discretion to determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion.'" *Id.* (quoting 5A Wright & Miller, *Federal Practice and Procedure*, § 1366 at 491 (2d ed. 1990)).

-5-

# ARGUMENT

## I.    THE PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED.

### A.    Political parody, "rhetorical hyperbole," "imaginative expression," and statements of opinion relating to matters of public concern that do not contain a provably false connotation receive full constitutional protection by the First Amendment to the United States Constitution.

A substantial layer of the enduring bedrock of our First Amendment liberties was formed in

the eloquent dissent of Justice Oliver Wendall Holmes in *Abrams v. United States*, 250 U.S. 616

(1919), in which several defendants were convicted of seditious libel.  Expressing his strong

disagreement with the imposition of criminal penalties for the publication of a "silly leaflet"

opposing American military intervention in Russia during Word War I, Justice Holmes explained:

> [W]hen men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out.
>
> That at any rate is the theory of our Constitution.  It is an experiment, as all life is an experiment.  Every year if not every day we have to wager our salvation upon some prophecy based upon imperfect knowledge.  While the experiment is part of our system I think that we should be eternally vigilant against attempts to check the expression of opinions that we loathe and believe to be fraught with death, unless they so imminently threaten immediate interference with the lawful and pressing purposes of the law that an immediate check is required to save the country.
>
> ... Only the emergency that makes it immediately dangerous to leave the correction of evil counsels to time warrants making any exception to the sweeping command, "Congress shall make no law abridging the freedom of speech."

250 U.S. 616, 630-31 (1919); *see also Whitney v. California*, 274 U.S. 357, 375-76 (1927)

(Brandeis, J., concurring) ("Believing in the power of reason as applied through public discussion,

[the Framers] eschewed silence coerced by law—the argument of force in its worst form").

### *New York Times v. Sullivan*

Almost half a century later, Justice William Brennan constructed solid constitutional architecture upon the foundation of such wisdom, proclaiming on behalf of a unanimous Supreme Court that "[w]hat a State may not constitutionally bring about by means of a criminal statute is likewise beyond the civil law of libel." *New York Times v. Sullivan*, 376 U.S. 254, 277 (1964). In that landmark decision, the Supreme Court reversed a civil libel verdict rendered in favor of a Montgomery, Alabama police commissioner against the *New York Times* and four prominent civil rights leaders for an advertisement that criticized the city's harsh repression of peaceful dissent by African-American clergymen in the segregated American South. In so holding, the Court made clear that actions brought pursuant to state defamation laws are severely limited by the free speech and free press protections enshrined in the First Amendment.[4] Specifically, the Supreme Court held that misstatements of fact or unjustified opinions published by the media about the conduct of public officials were deemed to be constitutionally privileged, unless the false or unjustified material was published with "actual malice," a concept defined as publication with actual knowledge of falsity or with reckless disregard of probable falsity. *New York Times*, 376 U.S. at 279-80. Such constitutional protections are rooted in the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," even though "it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," *id.* at 270, and the recognition that "[t]he fear of damage awards . . . may be markedly more inhibiting than the fear of prosecution under a criminal statute." *Id.* at 277.

---

[4]"[F]reedom of speech and of the press—which are protected by the first amendment from abridgement by Congress—are among the fundamental personal rights and 'liberties' protected by the due process clause of the fourteenth amendment from impairment by the states." *Gitlow v. New York*, 268 U.S. 652, 666 (1925)).

## *New York Times* rule extended to "public figures"

In *New York Times*, the Supreme Court expressly reserved the determination of "how far down into the ranks of government employees the 'public official' designation would extend for purposes of this rule, or otherwise to specify categories of persons who would or would not be included." *Id.* at 284 n.23.    Shortly thereafter, in *Curtis Publishing Co. v. Butts*, it extended application of the standard to public figures. 388 U.S. 130 (1967).  The term "public figure" includes those who are not public officials but nonetheless thrust themselves "into the 'vortex' of an important public controversy," as well as those who by status or position command a continuing public interest. *Id.* at 154-55 (quoting *Whitney*, 274 U.S. at 377 (Brandeis, J., concurring)).  The Supreme Court later elaborated on the concept of public figures, indicating that some "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes.  More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.  In either event, they invite attention and comment." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 336 (1974)

## Heightened protection extended to matters of public concern

Importantly, protection from the punitive reach of state defamation laws is not strictly limited to circumstances involving public officials and public figures. In *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 768-69 (1986), the Supreme Court addressed a situation involving a private-figure plaintiff who brought a suit for defamation resulting from speech addressing a matter of public concern. The Supreme Court held that where speech involves matters of public concern, even where a private figure is involved, a plaintiff must meet the constitutional burden of demonstrating "falsity, as well as fault," to recover damages. *See id.* at 776. As the Court explained, "[i]n a case presenting a configuration of speech and plaintiff like the one we face here, and where the scales are in such an

-8-

uncertain balance, we believe that the Constitution requires us to tip them in favor of protecting true speech." *Id.* at 776.

> [T]he need to encourage debate on public issues that concerned the Court in the governmental-restriction cases is of concern in a similar manner in this case involving a private suit for damages: placement by state law of the burden of proving truth upon media defendants who publish speech of public concern deters such speech because of the fear that liability will unjustifiably result. Because such a "chilling" effect would be antithetical to the First Amendment's protection of true speech on matters of public concern, we believe that a private-figure plaintiff must bear the burden of showing that the speech at issue is false before recovering damages for defamation from a media defendant. To do otherwise "could only result in a deterrence of speech which the Constitution makes free."

*Id.* at 777 (citations omitted); *see also Baumgartner v. United States*, 322 U.S. 665, 673-74 (1944) ("[o]ne of the prerogatives of American citizenship is the right to criticize public men and measures").

### "Rhetorical hyperbole," "vigorous epithets," held not actionable

The Supreme Court has also placed substantial constitutional limits on the type of speech that may properly be the subject of state defamation actions. In *Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6 (1970), the Supreme Court announced additional broad constitutional protection for "rhetorical hyperbole." In *Bresler*, the complainant was a real estate developer attempting to secure zoning variances from the Greenbelt City Council. As it happened, he also owned some land that the council was attempting to acquire for a school. The local newspaper published reports characterizing the developer's negotiating position as "blackmail," and the developer sued for libel. The Supreme Court squarely rejected the developer's contention that such liability could be premised upon the notion that use of the word "blackmail" implied that he had committed the actual crime of blackmail, holding "that the imposition of liability on such as basis was constitutionally impermissible—that as a matter of constitutional law, the word 'blackmail' in

these circumstances was not slander when spoken, and not libel when reported in the *Greenbelt News Review*." *Id.* at 13. As the Supreme Court explained:

> It is simply impossible to believe that a reader who reached the word "blackmail" in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense. On the contrary, <u>even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable</u>.

*Id.* at 14 (emphasis supplied). As a result, the Court held as a matter of law that "[t]o permit the infliction of financial liability upon the petitioners for publishing these two news articles would subvert the most fundamental meaning of a free press, protected by the First and Fourteenth Amendments." *Id.*

### Use of term "Traitor" specifically held not actionable

In *Old Dominion Branch No. 496, National Ass'n of Letter Carriers, AFL CIO v. Austin*, 418 U.S. 264, 286-87 (1974), the Supreme Court expressly held that the use of the word "traitor" in a union organizing newsletter's definition of the word "scab" was not actionable. The Supreme Court explained that in such a context, "<u>use of words like 'traitor' cannot be construed as representations of fact</u>." *Id.* at 284 (emphasis supplied). Instead, as with the use of the pejorative term "blackmail" at issue in *Bresler*, the Supreme Court held that it was "<u>similarly impossible to believe</u>" that anyone would have understood the newsletter "<u>to be charging the appellees with committing the criminal offense of treason</u>." *Id.* at 285 (emphasis supplied). Rather, the Supreme Court determined that the term was "merely rhetorical hyperbole, a lusty imaginative expression of the contempt felt by union members towards those who refuse to join," and was "obviously used . . . in a loose, figurative sense to demonstrate the union's strong disagreement with the views of those workers who oppose

-10-

unionization." *Id.* at 284-86.

### Parody held not actionable

In *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 50 (1988), the Supreme Court further held that the First Amendment precluded any recovery under state law for a parody, however inherently offensive to the individual it lampooned, that "could not reasonably have been interpreted as stating actual facts about the public figure involved." In *Hustler,* a minister brought suit against a magazine for a parody of an advertisement appearing in the magazine that depicted his first sexual experience as a "drunken incestuous rendezvous with his mother in an outhouse." *Id.* at 48. As the Supreme Court explained, the *Hustler* ad parody portrays the minister and his mother as "drunk and immoral, and suggests that respondent is a hypocrite who preaches only when he is drunk." *Id.* In small print at the bottom of the page, the magazine included the phrase "ad parody—not to be taken seriously" and the parody was listed in the table of contents as "Fiction; Ad and Personality Parody." *Id.*

Upon a review of past parodies and cartoons and their role in American political discourse, the Supreme Court observed that they are "often based on exploitation of unfortunate physical traits or politically embarrassing events—an exploitation often calculated to injure the feelings of the subject of the portrayal," and "often not reasoned or evenhanded, but slashing and one-sided." *Id.* at 54. Nonetheless, the Court concluded that "[f]rom the viewpoint of history it is clear that our political discourse would have been considerably poorer without them." *Id.* at 55. The Supreme Court then upheld the lower court's finding that the "*Hustler* ad parody could not reasonably be understood as describing actual facts about [the minister] or actual events in which he participated" and that the "ad parody 'was not reasonably believable.'" *Id.* at 57 (quoting lower court holding). Since the parody constituted speech that "could not reasonably have been interpreted as stating actual facts about the public figure involved," the Supreme Court affirmed that it was absolutely

-11-

protected by the First Amendment and no state law liability could be imposed. *Id.* at 50.[5]

## *Milkovich v. Lorain Journal Co.*

In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990), the Supreme Court summarized and reaffirmed previously existing constitutional safeguards in the free speech arena, but declined to recognize "still another first amendment-based protection for defamatory statements that are categorized as 'opinion' as opposed to 'fact.'" *Id.* at 17. Instead, the Supreme Court emphasized that existing First Amendment principles sufficiently secured the "breathing space" that "freedoms of expression require in order to survive." *Id.* at 19 (quoting *Philadelphia Newspapers*, 475 U.S. at 772 and *New York Times*, 376 U.S. at 272).

The first of these principles is that "a statement of opinion relating to matters of public concern which does not contain a provably false connotation will receive full constitutional protection." *Milkovich*, 497 U.S. at 20; *see also Philadelphia Newspapers*, 475 U.S. at 772. Second, the First Amendment also provides full protection for "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Milkovich*, 497 U.S. at 20; *see also Bresler*, 398 U.S. at 14, *Letter Carriers*, 418 U.S. at 284, *Falwell*, 485 U.S. at 50. As the Supreme Court explained, "[t]his provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our nation." *Milkovich*, 497 U.S. at 20. Third, "where a statement of 'opinion' on a matter of public concern reasonably implies false and defamatory facts regarding public figures or officials, those

---

[5] *See also Cantwell v. Connecticut*, 310 U.S. 296, 310 (1940) ("To persuade others to his point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy").

individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth." *Milkovich*, 497 U.S. at 20. Similarly, "where such a statement involves a private figure on a matter of public concern," a plaintiff must also show that the false connotations were made with some level of fault. *Id.* (citing *Gertz*, 418 U.S. at 323).

In sum, the Supreme Court's staunch and multi-layered defense of free speech set forth in *New York Times* and its progeny makes clear that even "vehement, caustic, and sometimes unpleasantly sharp attacks" are protected by the First Amendment. *New York Times*, 376 U.S. at 270. Indeed, "even when a speaker or writer is motivated by hatred or ill will his expression [is] protected by the First Amendment." *Hustler*, 485 U.S. at 53 (citing *Garrison v. Louisiana*, 379 U.S. 64 (1964)). "Freedoms of expression require 'breathing space,'" lest speakers be intimidated and public debate shrivel. *Philadelphia Newspapers*, 475 U.S. at 772 (quoting *New York Times*, 376 U.S. at 272).

**B.     The Defendant's political speech, expressed in the form of parody and specifically labeled as such, constitutes nothing more than "rhetorical hyperbole" that no reasonable reader could interpret as stating actual defamatory facts and is therefore absolutely protected by the First Amendment.**

In *Milkovich*, the Supreme Court analyzed statements in a newspaper column to determine whether or not a reasonable factfinder could conclude that certain statements implied a believable assertion that Milkovich actually perjured himself in a judicial proceeding. 497 U.S. at 21. The Court also reaffirmed beyond constitutional quarrel that where "loose, figurative, hyperbolic language" or the "general tenor" of the speech in question "would negate the impression that the writer was seriously maintaining that petitioner committed the crime of perjury," the speech would be absolutely protected by the First Amendment. *See id.* This is so because no liability can ever be imposed for speech that "cannot 'reasonably [be] interpreted as stating actual facts' about an

-13-

individual." *Id.* at 20 (quoting *Falwell*, 485 U.S. at 50).[6]

The controlling question to be asked in the resolution of this motion, therefore, is whether reasonable readers would interpret Senator Abourezk's presence, included with the Dixie Chicks, Barbra Streisand, Whoopi Goldberg, Vice-President Gore, and approximately one hundred other celebrities, politicians, and public figures on the ProBush.com political website's tongue-in-cheek "Traitor List"—which is expressly labeled with the disclaimer "*Parody. Not to be taken seriously. These 'traitors' are not legal 'traitors' of the United States, although we wish they were"—as stating actual false and defamatory facts about the Plaintiff, or whether it instead constitutes political parody, a partisan "vigorous epithet," "imaginative expression," or "rhetorical hyperbole" that is absolutely protected by the First Amendment.

As revealed by the Supreme Court's analysis of the statements in *Milkovich*, when determining whether a statement alleged to be a defamatory falsehood purports to state or imply "actual facts about an individual," courts must scrutinize the type of language used, the meaning of the statement in context, whether the statement is verifiable, and the broader social circumstances in which the statement was made. 497 U.S. at 21-22; *and see id.* at 24 (Brennan, J., dissenting). In analyzing these factors, courts have been cognizant of the admonition by Justice Holmes that "[a]

_____

[6]Although the characterization of Senator Abourezk as a "public figure" is not necessarily controlling on the resolution of this motion, he clearly fits into that classification. According to the Complaint and the public record, Abourezk is a former Congressman and U.S. Senator, a published author and photographer, and a frequent commentator on public affairs. In fact, his photograph on Defendant's website features the Plaintiff speaking to a public forum. Moreover, by adding his vigorous opinions and public voice to those citizens who opposed the war in Iraq, the movement which prompted the Defendant's creation of the website in question, Plaintiff joined a long list of celebrities, writers, and politicians who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 336; *see also* Marino Aff., Exs. D, E, F, G, H, and I. As a public figure, the "Constitution clearly requires the Plaintiff to surmount a much higher barrier" in order to prevail in a defamation claim. *Philadelphia Newspapers*, 475 U.S. at 775.

-14-

word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary

greatly in color and content according to the circumstances and the time in which it is used." *Towne*

*v. Eisner*, 245 U.S. 418, 425 (1918).

### 1.    Type of language used

The ProBush.com website's "Traitor List™" employs identical language to that examined

in *Letter Carriers*, which the Supreme Court has already expressly held to be non-actionable. 418

U.S. at 286-87. As *Letter Carriers* explained, when employed as a mere figurative expression of

vitriol, the "use of words like 'traitor' cannot be construed as representations of fact." *Id.* at 284.

Rather, the use of such language on the ProBush.com website is "merely rhetorical hyperbole, a lusty

imaginative expression of the contempt" conveyed on the website "towards those who refuse to"

support President Bush and his decision to use military force in Iraq, and was "obviously used . . .

in a loose, figurative sense to demonstrate" the website's "strong disagreement with the views of

those . . . who oppose" the President's policies. *Id.* at 284-86. Just as with the use of the term

"blackmail" in *Bresler*, 398 U.S. at 14, it is "impossible to believe" that anyone could understand

the ProBush.com website "to be charging [Senator Abourezk] with committing the criminal offense

of treason." *Letter Carriers*, 418 U.S. at 285. Indeed, while the term "traitor" can be used to refer

to someone who has committed the actual crime of treason against the United States, the more

common dictionary definition of the term is "one who betrays another's trust or is false to an

obligation or duty." Webster's New Collegiate Dictionary at 1239 (G. & C. Merriam Co. 1976).

Clearly, the use of the term "traitor" on this particular website is intended as figurative and vitriolic

political criticism. As the United States Court of Appeals for the First Circuit has explained:

> The First Amendment's shielding of figurative language reflects the reality that
> exaggeration and non-literal commentary have become an integral part of social
> discourse. For better or worse, our society has long since passed the stage at which

-15-

> the use of the word "bastard" would occasion an investigation into the target's lineage or the cry "you pig" would prompt a probe for porcine pedigree. Hyperbole is very much the coin of the modern realm. In extending full constitutional protection to this category of speech, the *Milkovich* Court recognized the need to segregate casually used words, no matter how tastelessly couched, from fact-based accusation.

*Levinsky's Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 128-31 (1st Cir. 1997) (further explaining that "[c]ertain excesses of language cannot ground a defamation claim because in context those excesses involve only puffery or epithets, and thus are insufficiently fact-based," and "certain turns of phrase" such as "traitor" and "blackmail" are "recognized rhetorical devices" that "are not actionable because they are commonly understood, in context, as imaginative expressions rather than statements of fact") (emphasis in original removed); *see also Campbell v. Citizens For An Honest Government, Inc.*, 255 F.3d 560, 567-68 (8th Cir. 2001); *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1446-47 (8th Cir. 1989); *Lauderback v. American Broadcasting Companies, Inc.*, 741 F.2d 193, 195-97 (8th Cir. 1984).

This is doubly so where the language in question precisely defines what is intended by referring to the individuals appearing on the website as "Traitors." At the top, the website clearly defines the term "Traitor" for purposes of its "Traitor List™" as: "Traitor: If you do not support our President's decisions you are a traitor." This exceedingly loose definition of the term clearly signals to the reader that its usage is not literal in the sense of asserting that those appearing on the list are guilty of specific criminal conduct. *See Dilworth v. Dudley*, 75 F.3d 307, 310 (7th Cir. 1996) (dismissing defamation on a 12(b)(6) motion where author defined term "crank"). No reasonable person could understand such a definition as actually contending as a factual matter that every person in the United States who disagrees with decisions made by President Bush is guilty of committing the criminal offense of treason.

Nowhere, moreover, does the website state that the persons appearing on the "Traitor List™"

are actually guilty of committing any crime. To the contrary, as acknowledged in the Plaintiff's

complaint, the website expressly states that it is a "*Parody. Not to be taken seriously. These

'traitors' are not legal 'traitors' of the United States, though we wish they were." In sum, as a matter

of constitutional law, the actual language used on the ProBush.com website, even when completely

divorced from its surrounding context, does not state an actionable claim for defamation.

### 2.    Meaning of the statement in context

When one proceeds to examine the context of Senator Abourezk's inclusion on the

ProBush.com website's "Traitor List™," it becomes even more apparent that no one could

reasonably interpret the website as stating actual false and defamatory facts about Senator Abourezk,

rather than political criticism in the form of "rhetorical hyperbole." First, the website itself is clearly

and expressly identified as a method of expressing political commentary. The name of the website

itself is "ProBush.com." No reasonable person could pull up a "ProBush.com" website that sells

"ProBush.com Gear!" and features a "ProBush.com Poster Store!" and not understand that he or she

was being subjected to a partisan and political viewpoint in support of President Bush and against

those who oppose or criticize him. Second, it is manifestly apparent that the website's allegedly

trade-marked "Patriot List™" and "Traitor List™" are simply intended to identify public figures

who either share its uncritical support of President Bush and his policies or pointedly and publicly

do not. Third, the inclusion of Senator Abourezk's name within a list of more than one hundred

movie stars, famous musicians, and politicians reveals to any potential reader that the "Traitor

List™" is not an actual list of criminals. No person could view the "Traitor List™" and reasonably

conclude that Barbra Streisand, Whoopi Goldberg, Madonna, Casey Kasem, the Dixie Chicks,

President Carter, Vice-President Gore, Senator Kennedy, Senator Clinton, and Senator Abourezk

-17-

are all persons who are guilty of committing the actual crime of treason against the United States. Indeed, some of the celebrity photographs have jokes or satirical comments appearing next to them. Next to Oliver Stone, the caption "How about another conspiracy theory" appears. Next to the actor Mike Farrell, the website advises, "Stick to your MASH unit, B.J." To Martin Sheen's photograph is ascribed the admonition, "You just play a president on TV so stop acting like one." Sean Penn's portrait elicits the comment, "Dude! Are you as stupid as you look!"

The viewer also receives a verbal signal as to the figurative nature of the term "traitor" upon hearing the audio clip, "You're the Traitor," from the Hollywood film "Man in the Iron Mask," immediately upon opening the list. And again, the context is specifically identified on the website itself as being a "*Parody" that is "Not to be taken seriously," with the express admonishment that "These 'traitors' are not legal 'traitors' of the United States, though we wish they were." Viewed in context, it corrupts all notions of common sense to suggest that anyone could reasonably interpret the ProBush.com website's list of celebrities and public figures as constituting a literal criminal indictment of, rather than a partisan political attack upon, those celebrities and public figures.

### 3. Whether the statement is verifiable

Moreover, the "statement" at issue, which takes the form of Senator Abourezk's inclusion on the ProBush.com website's celebrity "Traitor List™," contains a specific definition of "traitor" as someone who does not support the President and his decisions: "Traitor: If you do not support our President's decisions you are a traitor." This does not constitute an assertion of objective fact, but rather a generic and unverifiable *ad hominem* broadly directed at a large group of famous individuals, including Senator Abourezk, who have generally expressed public criticism of President Bush and his decision to authorize military action in Iraq. Such an assertion does not qualify as a form of verifiable, literal falsehood that could lead anyone to believe that the website was stating a

-18-

concrete, objective fact about the Plaintiff in this case. *See Secrist v. Harkin*, 874 F.2d 1244, 1251 (8th Cir. 1989) (holding that implications regarding appointment of Marine officer to Senator's staff enhancing campaign contributions from defense contractors were, in context, "not so precise, specific, or verifiable that they can be equated—as Secrist alleges—as akin to an accusation of criminal conduct"); *McCabe v. Rattiner*, 814 F.2d 839, 842-43 (1st Cir. 1987) (holding that newspaper headline that referred to plaintiff's real estate development as a "scam" was not actionable because the word means different things to different people and "[t]he lack of precision makes the assertion 'X is a scam' incapable of being proven true or false"); *Fudge v. Penthouse*, 840 F.2d 1012, 1017 (1st Cir. 1988) (rejecting a defamation claim brought by four pre-teen girls based on a headline depicting them as "amazons" because such language constitutes "no more than rhetorical hyperbole," and the "average reader understands that the headline is the editors' ironic comment. . ., rather than a literal representation"). The general tenor of the website, which is clearly satirical and political, further serves to emphasize that the "Traitor List™" is a parody, or political and satirical "expression of contempt," that is incapable of being proven false and does not constitute a serious statement of fact.

## 4. The broader social circumstances in which the statement was made

Finally, the broader social circumstances in which the "Traitor List™" appears clearly demonstrate that it does not constitute an actual and believable accusation of criminal conduct. It is plain from the website that it is intended to inject a particular viewpoint into the stream of political discourse regarding President Bush's decision to authorize war with Iraq. The "social context" of the "Traitor List" is therefore the often tumultuous public debate over war and peace, a subject that

-19-

is supremely contentious and subject to heated discussion and debate.[7]

Equally significant is the medium of expression into which that political viewpoint was deposited. The free-wheeling and robust nature of Internet speech signals to readers that the ProBush.com website is a repository for partisan expressions of "rhetorical hyperbole" that constitute protected political speech. In *Ollman v. Evans*, the United States Court of Appeals for the District of Columbia discussed the evolution of the Internet's precursors:

> From the earliest days of the Republic, individuals have published and circulated short, frequently sharp and biting writings on issues of social and political interest. From the pamphleteers urging revolution to abolitionists condemning the evils of slavery, American authors have sought through pamphlets and tracts both to stimulate debate and to persuade. Today among the inheritors of this lively tradition are the columnists and opinion writers whose works appear on the editorial and Op-Ed pages of the Nation's newspapers. The column at issue here is plainly part and parcel of this tradition of social and political criticism.

750 F.2d 970, 986 (D.C. Cir. 1984). Although pre-dating the ascendency of the Internet, the *Ollman* decision contemplates the growth of new mediums for political debate and discourse. Congress and the courts have affirmatively recognized the unique and growing importance of Internet speech. As the Supreme Court has noted, "[t]he Internet is 'a unique and wholly new medium of worldwide human communication,'" *Reno v. ACLU*, 521 U.S. 844, 850 (1997), and "[t]hrough the use of Web pages . . . [an] individual can become a pamphleteer." *Id.* at 870. As a result, the "'Internet represents a brave new world of free speech'" and "'is fundamentally different from traditional form of mass communication.'" *Blumenthal v. Drudge*, 992 F.Supp. 44, 48 n.7 (D.C. Cir. 1998) (citation

---

[7]*See, e.g., Dworkin v. L.F.P., Inc.*, 839 P.2d 903, 916 (explaining that "[j]ust as labor's historical confrontation with management presents a widely recognized arena in which bruising and brawling, rough and tumble debate in daily fare, so does the social, moral, and political clash between pornographers and antipornographer . . . In such a heated and spirited confrontation, of which the statements are a part, abusive epithets, exaggerated rhetoric and hysterical hyperbole are expected").

omitted). Significantly, in enacting statutory protections such as the Communications Decency Act, 47 U.S.C. § 230, Congress has "recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium" and sought to protect the "vast democratic forums of the Internet." *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997); *see also Patentwizard, Inc. v. Kinko's, Inc.*, 163 F.Supp.2d 1069, 1071-72 (D.S.D. 2001). Although Internet speakers have not been afforded complete immunity from civil suits, it is clear that "Congress wanted to encourage the unfettered and unregulated development of free speech on the Internet" and "to prevent lawsuits from shutting down websites and other services on the Internet." *Batzel v. Cremers*, 333 F.3d 1018, 1027-28 (9th Cir. 2003).

### *Evel Knievel v. ESPN, Inc.*

Numerous courts have applied governing Supreme Court precedent to circumstances very similar to those in the present case and granted a defendant's motion to dismiss for failure to state a claim. Many of those cases have involved parody or "rhetorical hyperbole" as appears on the ProBush.com website. For example, in *Evel Knievel v. ESPN, Inc.*, 223 F. Supp. 2d 1173, 1175 (2002), the ESPN.com website had posted a "Green Carpet Gallery" consisting of photographs of celebrities who had attended the ESPN Action Sports and Music Awards. Included within the gallery was a picture of the former motorcycle daredevil and his wife with the caption, "Evel Knievel proves that you're never too old to be a pimp." *Id.* at 1176. Knievel filed a claim for defamation against the owner of the website, claiming that ESPN was actually alleging that he was a pimp and his wife a prostitute: "Plaintiffs counter that use of the word 'pimp' charges Evel Knievel with a criminal offense. Plaintiffs also assert that by implication, Krystal Knievel is being accused of being a prostitute. Plaintiffs argue that the caption is not humorous, bears a defamatory meaning, constitutes libel per se, and is actionable on its face." *Id.* at 1179.

ESPN brought a motion to dismiss, contending that "no reasonable person would believe the caption underneath the picture of Evel Knievel was alleging that Evel Knievel [was] actually a pimp or that Krystal Knievel [was] involved in prostitution." *Id.* The district court agreed, and granted the motion to dismiss, concluding that "[t]he website was obviously directed at a younger audience and contained loose, figurative, slang language such that a reasonable person would not believe ESPN was actually accusing Plaintiffs of being involved in criminal activity." *Id.* The court noted that the "general tone of the ESPN.com website and the Green Carpet Gallery was one of tongue-in-cheek humor and slang that was not meant to be taken seriously" and that a reasonable person "would understand that pimp is being used in a figurative sense." *Id.* at 1180. As the court further explained:

> Plaintiffs seek to justify their cause of action by prescribing the meaning they wish to the term "pimp." This is not the standard by which a libel action is measured. If it were, a defamation action would lie any time a person was offended by a term that could have a negative meaning. That a term is capable of having a defamatory meaning, it does not necessarily follow that the meaning is reasonable when considered in the context in which it was uttered.

*Id.* at 1181. The court also considered the context of the statement, specifically noting that "a viewer had to click through numerous other pictures" on the website, circumstances directly applicable to the present case, where Plaintiff's picture appears among numerous other Hollywood celebrities and politicians. *Id.* As a result, the district court held that "[b]ecause a reasonable person would not believe the caption under the photo of the Plaintiffs was accusing Evel Knievel of being a pimp in the criminal sense, Plaintiff Evel Knievel's claims against ESPN must be dismissed." *Id.* at 1182-83.

### *Cochran v. NYP Holdings, Inc.*

The circumstances in *Cochran v. NYP Holdings, Inc.*, 58 F.Supp. 2d 1113 (C.D. Cal. 1998), *aff'd*, 210 F.3d 1036 (9th Cir. 2000), are also similar to the present action. In *Cochran*, attorney

Johnnie Cochran brought a libel action against the *New York Post* and one of its columnists, Andrea Peyser, resulting from an article that described Cochran's role as part of the O.J. Simpson defense team and his rumored participation in the representation of Abner Louima, a Haitian immigrant tortured by police officers in New York City. *See id.* 1116. Cochran objected to the columnist's statement that, based upon his past history, the attorney "will say or do just about anything to win, typically at the expense of the truth." *Id.* at 1115. Cochran alleged that such a statement, when read with the entire column, implied that his representation of O.J. Simpson involved unethical conduct. *See id.* at 1117.

Assessing the "totality of the circumstances," the "tone" of the article, the fact that the article was "formatted as opinion," and the "loose, figurative, and hyperbolic" nature of the language, the district court found the statement nonactionable and dismissed Cochran's claim. *Id.* at 1121-24. The headline of the article, "Nightmare Team is Taking Over," was an obvious pejorative reference to Cochran's participation in Simpson's "Dream Team" defense. *Id.* at 1123. The court further noted that a picture of Cochran appeared above the article which was captioned "HERE'S JOHNNIE: Johnnie Cochran wants to use his successful defense of O.J. Simpson to work his way onto Abner Louima's legal team," which signaled to the reader that the "column is formatted as opinion rather than as a standard news article." *Id.* at 1123. The court held that the statement in question could not "reasonably be understood as anything more than Peyser weighing in on the public debate over the Louima case and its impending collision with the Simpson saga, which she apparently hopes to avert." *Id.* at 1123. The statement therefore failed, as a matter of constitutional law, to allege a defamatory statement and justified the district court's grant of a motion to dismiss. *See id.* at 1126.

### *Dworkin v. L.F.P., Inc.*

Yet another similar case is *Dworkin v. L.F.P., Inc.*, 839 P.2d 903, 915 (Wy. 1992). *Dworkin*

-23-

involved perennial defamation defendant *Hustler* magazine, which had made derogatory statements about Professor Andrea Dworkin which, in the interest of decorum, need not be repeated. In affirming the trial court's grant of judgment as a matter of law, the *Dworkin* court summarized controlling Supreme Court precedent by concluding that "rhetorical hyperbole," including "[a]busive epithets, vulgarities and profanities are not actionable." *Id.* at 915. As the court explained, "[t]he *ad hominem* nature of such language easily identifies it as rhetorical hyperbole which, as a matter of law, cannot reasonably be understood as statement of fact." *Id.* As the court further observed, "[c]ertain formats–editorials, reviews, political cartoons, monthly features–signal the average reader to expect a departure from what is actually known by the writer as fact." *Id.* The court was "convinced that the average reader is fully aware that the statements found [in the *Hustler* feature] are not 'hard news.'" *Id.* As a result, "[u]nder prevailing constitutional First Amendment safeguards, that language cannot, as a matter of law, form the basis for a defamation claim." *Id.*; *see also Horsley v. Rivera*, 292 F.3d 695, 701-03 (11th Cir. 2002) (holding that television talk show host Geraldo Rivera's statement that anti-abortion activist was "accomplice" to doctor's murder based upon his inclusion of doctor's name on website list of physicians who performed abortions was protected by First Amendment as non-literal rhetorical hyperbole);*Weyrich v. The New Republic, Inc.*, 235 F.3d 617, 624-25 (D.D.C. 2001) (holding that statements in magazine article that conservative political leader had suffered bouts of pessimism and paranoia, and characterizations of him as suspicious, pessimistic, and "nutty" were not actionable, verifiable statements); *Buckley v. Littell*, 539 F.2d 882, 893-94 (2d Cir. 1976), *cert. denied*, 429 U.S. 1062 (1977) (holding that use of term "fascist" to describe author William F. Buckley could not be regarded as verifiable statement of fact in defamation action); *Ollman*, 750 F.2d at 986 (holding that statements set forth in syndicated newspaper column that professor was "Marxist" were entitled to absolute *First*

-24-

Amendment protection); *Gold v. Harrison*, 962 P.2d 353, 361-62 (Haw. 1998) (holding that artist's statement "I'm being raped by all these people," was constitutionally protected rhetorical hyperbole and affirming Rule 11 sanctions against attorney for filing frivolous complaint); *Yeagle v. Collegiate Times*, 497 S.E.2d 136, 137-39 (Va. 1998); *Sanders v. Smitherman*, 776 So.2d 68, 73-75 (Ala. 2000); *Pullum v. Johnson*, 647 So.2d 254, 257 (Fla. Ct. App. 1994).

## CONCLUSION

As the United States Court of Appeals for the Eighth Circuit has explained, "those who place themselves in the political arena or willingly participate in public debate 'must accept a degree of derogation that others need not'" and "must, in effect, have 'tougher hides.'" *Secrist*, 874 F.2d at 1249 (internal citations omitted). Senator Abourezk's attempt to employ the federal courts to silence and punish the implicit political criticism of him expressed by his inclusion, alongside the Dixie Chicks, Vice-President Gore, Susan Sarandon, and Barbra Streisand, on the ProBush.com website's satirical "Traitor List™," is not permitted by the First Amendment, however unfair or inflammatory he may find that criticism to be. The Supreme Court's line of cases in *Bresler*, *Letter Carriers*, *Hustler*, and *Milkovich*, which trace their lineage to the visionary dissent of Justice Holmes in *Abrams*, provide absolute constitutional protection in these circumstances, where no person could reasonably interpret the website as anything other than caustic parody, partisan "rhetorical hyperbole," and protected political speech.

WHEREFORE, Defendant ProBush.com, Inc. respectfully requests that this Honorable Court grant its Motion to Dismiss.

Dated this 30th day of July, 2003.

**JOHNSON, HEIDEPRIEM, MINER,
MARLOW & JANKLOW, L.L.P.**

**BY** ~KAPARSONS~

Ronald A. Parsons, Jr.
Jon K. Lauck
P.O. Box 1107
Sioux Falls, SD 57101-1107
(605) 338-4304

*Attorneys for Defendant ProBush.com, Inc.*

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of **Defendant ProBush.com,**

**Inc.'s Brief in Support of Its Rule 12(b)(6) Motion to Dismiss** was on this day sent via first class

mail, postage prepaid, to the following:

Todd D. Epp
Of Counsel
Abourezk Law Offices, P.C.
P.O. Box 1164
Sioux Falls, SD 57101-1164

*Attorneys for the Plaintiff*

Dated this 30th day of July, 2003.

~KAPARSONS~

Ronald A. Parsons, Jr.