UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| JAMES G. ABOUREZK; JANE FONDA; ROXANNE DUNBAR-ORTIZ, | ) ) ) | Civ. No. 03-4146 |
|  | ) |  |
| Plaintiffs, | ) | |
|  | ) | **DEFENDANTS' BRIEF IN SUPPORT OF** |
| vs. | ) | **MOTION FOR SUMMARY JUDGMENT** |
|  | ) |  |
| PROBUSH.COM, INC., a Pennsylvania Corporation; MICHAEL MARINO; and BEN MARINO, | ) ) ) | |
|  | ) | |
| Defendants. | ) | |
|  | ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On First Amendment grounds, Defendants ProBush.com, Inc., Michael Marino, and Ben Marino have filed a motion for summary judgment on the complaint filed by Plaintiffs James G. Abourezk, Jane Fonda, and Roxanne Dunbar-Ortiz. The Defendants' motion is supported by a Statement of Undisputed Facts, and documentary evidence appearing in the record. The Defendants respectfully submit this brief in support of their motion.

## BACKGROUND

### Senator Abourezk

Plaintiff James G. Abourezk is "an honorably discharged veteran of the United States Navy, a former United States Congressman, and a former [United States] Senator" for the State of South Dakota. *See* Plaintiff's Complaint, ¶10. In addition, "Mr. Abourezk has had a long and distinguished career as an amateur and professional photographer as well as an author. His photographs have appeared in the *Washington Post* and other publications. He has also authored two books, 'Through Different Eyes,' co-authored with Hymen Bookbinder, and 'Advise and

Dissent.'"[1]

Senator Abourezk was a signatory to the famous Not In Our Name petition organized to oppose an invasion of Iraq by the United States in 2003.  *See* Abourezk Dep. at 24; 40-41 Abourezk Dep. Exhibit 7.  He hoped that the Not In Our Name petition would garner worldwide publicity, which it did.    Abourezk Dep. at 25.  Senator Abourezk knew that the petition was going to be published nationally in the New York Times, USA Today and Los Angeles Times. Abourezk Dep. at 25.  In addition, Senator Abourezk made several public speeches opposing the invasion of Iraq, and organized a group of former U.S. Senators who issued press releases and granted media interviews opposing the invasion.  Abourezk Dep. at 29; Exhibit 8.  Senator Abourezk also traveled to Iraq with other public officials and journalists, met with officials from the Iraqi government, and asked the Iraqi government to "Please remove the excuses for Bush invading Iraq, because he wants to invade.  Please remove the excuses by allowing the weapons inspectors to come into Iraq."  Abourezk Dep. at 30.  Senator Abourezk's statements regarding his opposition to the invasion of Iraq and Middle Eastern policy were heard and reported in the Middle East and throughout the world.  Abourezk Dep. at 41-42; Abourezk Dep. Exhibit 16.

### Roxanne Dunbar-Ortiz

Roxanne Dunbar-Ortiz is a renowned author, historian and professor in the Department of Ethnic Studies at California State University.  Abourezk Dep. at Exhibit 1.  Dunbar-Ortiz is the author of "In Red Dirt, Growing up in Okie," and "Outlaw Woman: A Memoir of the War Years 1960-1975," which illustrate her lifelong public activism on many issues of national

---

[1]Verified Complaint of James G. Abourezk, *Abourezk v. The National Geographic Society*, CIV. 02-4179 (D.S.D. May 20, 2002).

concern.  Exhibit 27.  Dunbar-Ortiz has also authored and published "Roots of Resistance: Land: Tenure in Mexico," and "The Great Sioux Nation and Indians of the Americas."  Exhibit 27.

Dunbar-Ortiz was a founding member of the early women's liberation movement in the United States.  Exhibit 28; Exhibit 29.  She has also been a dedicated anti-war activist and organizer through the 1960's and 1970's, and against the invasion of Iraq in 2003.  Exhibit 28; Exhibit 29 (back cover); Exhibit 7.  She has been a public speaker on issues of patriarchy, capitalism, imperialism, and racism.  Exhibit 28; Exhibit 29 (back cover).  She has worked in Cuba with the Venceremos Brigade and formed associations with other revolutionaries across the spectrum of radical and underground politics, including the SDS, the Weather Underground, the Revolutionary Union, and the African National Congress.  Exhibit 28; Exhibit 29 (back cover).  Dunbar-Ortiz has authored numerous published articles including "Declaration of War on Male Supremacy, Female Liberation Must be the Basis for Social Revolution or There Will Be No Social Revolution!," "The Imperialist Origins of the US," and "One or Two Things I Know About Us: Rethinking the Image and Role of the Oakies."  Exhibit 33; Exhibit 34; Exhibit 35.  During her speech, "The Grid of History: Cowboys and Indians," Dunbar-Ortiz made clear her belief that the only way to end U.S. imperialism is to end the U.S. empire, noting that this ending means dismantling imperialism, not devolution, and creating something different instead and the U.S. and its people must be involved in this process, declaring in this context that "there cannot be too much anti-Americanism for me; I welcome it."  Exhibit 30; Exhibit 31.  Dunbar-Ortiz also signed the famous Not In Our Name petition publicized worldwide to oppose the invasion of Iraq.  Exhibit 7.

**Jane Fonda**

–3–

Jane Fonda is a renowned film actress and civic activist.  Abourezk Dep. Exhibit 1. Fonda is a member of one of the most celebrated families in American cinema, beginning her film career in the early 1960's.  Exhibit 41.  She has appeared in more than 40 films.  Exhibit 37. She starred in and produced "Jane Fonda's Complete Workout" which sold nearly 17 million copies. Exhibit 37; Exhibit 40.  Ms. Fonda has been on numerous magazine covers going back several decades, including the cover of Life magazine in March 1968.  Exhibit 39.  Fonda became involved in political activism during the time of the Vietnam War, Civil Rights Reforms and significant rebellion against the "Establishment."  Exhibit 39.  In April 1970, Fonda along with Fred Gardner and Donald Sutherland formed "Free The Army," an antiwar road show. Exhibit 39.  In 1970, Fonda spoke out against the war at a rally organized by Vietnam Veterans Against the War, in Valley Forge, Pennsylvania.  Exhibit 39. Beginning in November 3, 1970, Fonda toured college campuses and raised funds for the organization, Vietnam Veterans Against the War.  Exhibit 39.  Fonda funded and organized the Indochina Peace Campaign which continued to mobilize antiwar activists across the nation after the 1973 Paris Peace Agreement when most other antiwar organizations closed down.  Exhibit 39.  Fonda founded Adolescent Pregnancy Prevention for teenage girls and is currently heading the Georgia campaign. Exhibit 37.  She participates in peace activism.  Exhibit 39.

Fonda was honored by Barbara Walters in 1999 as one of the "100 great women of the century."  Exhibit 41.  She has recently authored a book titled "My Life So Far," which is an autobiography of her celebrated life.  Exhibit 36; Exhibit 37.  In April 2005, Fonda appeared on 60 Minutes in an interview with correspondent Lesley Stahl.  Exhibit 40.  Fonda's newest movie release, "Monster In Law" debuted in early May of 2005.  Exhibit 38; Exhibit 39.  Ms. Fonda

also signed the famous Not In Our Name Petition opposing the invasion of Iraq.  Exhibit 7.

## ProBush.com

Defendant ProBush.com, Inc. is a Pennsylvania corporation with its principal place of business in West Point, Pennsylvania.  *See* Plaintiff's Complaint at ¶2.  ProBush.com, Inc. publishes an internet website under the domain name ProBush.com.  *See id.* at ¶6.

True to its name, the ProBush.com website expresses and encourages support for President George W. Bush.  The initial page of the website contains a photograph of the President emblazoned with the headings "President of the United States" and "George Walker Bush."  Affidavit of Michael Marino, Ex. A.  Below the image are three captions labeled "Our Hero," "Hail to the Chief," and "Support Our Troops."  *See id.*  The "Our Hero" caption links to a page that displays free Iraqi citizens expressing gratitude to the United States and President Bush for the liberation of Iraq.  The "Hail to the Chief" caption links to a page that displays a photograph of President Bush with an American flag in the background.  The "Support Our Troops" caption links to a page that itself links to websites for various military support and relief organizations, such as the USO and the American Red Cross, and encourages visitors to participate in or provide financial support for those organizations.  The website also provides links to various other web pages, news stories, and opinion pieces that are generally supportive of President Bush, his Administration, and the United States military.  In addition, the website advertises "ProBush.com" apparel, posters, and other items.  At the top of the home page, above the photograph of President Bush, is a list of links to various other pages included on the website, two of which are labeled "Patriot List™" and "Traitor List™."  *See* Marino Aff., Ex. A.

## The "Patriot List"

The "Patriot List" begins with what appears to be a dictionary definition of the term: "PATRIOT, n.  One who loves his country, and zealously supports its authority."  Marino Aff., Ex. B.  It then states "IF YOU DO SUPPORT OUR PRESIDENTS [sic] DECISIONS YOU ARE A PATRIOT TO OUR COUNTRY!"   The list that appears below consists of two categories.  The first category of "Patriots" are individuals from around the country who have apparently accepted the site's invitation that states: "If you wish to become an Official ProBush.com Patriot please email your full name, age and state to PatriotList@probush.com." The second category is made up of what are termed "Honorary Patriots," and includes the names and photographs of Bruce Willis, Dennis Miller, Clint Black, Tippi Hedren, Rush Limbaugh, and other Hollywood celebrities, musicians, political commentators, and public figures who presumably support President Bush.  At the bottom, this page provides a mechanism by which a visitor to the site can "Add an Honorary Patriot."

### The "Traitor List"

The "Traitor List" begins with what appears to be a dictionary definition of the word "treason," stating: "Treason: Violation of allegiance toward one's country or sovereign, especially the betrayal of one's country by waging war against it or by consciously and purposely acting to aid its enemies."   Marino Aff., Ex. C.  It then provides the website's definition of a "Traitor" for purposes of its "Traitor List," stating: "Traitor: If you do not support our President's decisions you are a traitor."   Next, the sentence "Get to know your traitor!" appears.  The website also states: "*Parody.  Not to be taken seriously.  These 'traitors' are not legal 'traitors' of the United States."[2]

---

[2]At the time that the Plaintiff's complaint was filed, this disclaimer appeared at the bottom, rather than the

The "Traitor List" is comprised of the names and photographs of movie stars, musicians, politicians, and other public figures (many of them famous signatories of the celebrated "Not in Our Name" anti-Iraq war petition published worldwide), who presumably do not support President Bush or his decision to authorize military action in Iraq.  There are well over one hundred names on the "Traitor List," including Barbra Streisand, Susan Sarandon, Martin Sheen, Sean Penn, Madonna, Whoopi Goldberg, President Jimmy Carter, Vice-President Al Gore, Senator Ted Kennedy, Senator Hillary Clinton, House Minority Leader Nancy Pelosi, Oliver Stone, Peter Arnett, Michael Moore, Edward Asner, Noam Chomsky, Bonnie Raitt, Casey Kasem, and the country music band, "The Dixie Chicks."  In addition, some individuals who visit the website apparently send in a picture and request to be placed on the list.   Somewhere in the middle of the list, five or six places down from Vice-President Gore and Senator Clinton, and two places up from "Patch Adams," Senator Abourezk's name is listed and his photograph appears.  Jane Fonda and Roxanne Dunbar-Ortiz also appear on the list.

The names of these famous politicians, celebrities, movie stars, musicians, and public activists appear on the "Traitor List" because they were taken from the "Not In Our Name Petition" opposing the invasion of Iraq.  *See* Defendants' Statement of Undisputed Facts, ¶¶ 68, 69, 70.

## STANDARD OF REVIEW

When considering a motion for summary judgment, the question for the court is "whether

---

top, of the "Traitor List."  *See* Affidavit of Michael Marino, ¶11.  A previous version of this sentence appearing on the website included the additional phrase, "though we wish they were."  *See id.*

–7–

the record, when viewed in the light most favorable to the non-moving party, shows that there is

no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law." *Trimble v. Asarco, Inc.*, 232 F.3d 946, 955 (8th Cir. 2000); *see also* Fed. R. Civ.

P. 56(c); *Celotax Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).


## ARGUMENT

### I.   SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFFS' CLAIMS.

**A.   Political parody, "rhetorical hyperbole," "imaginative expression," and statements of opinion relating to matters of public concern that do not contain a provably false connotation receive full constitutional protection by the First Amendment to the United States Constitution.**

In *New York Times v. Sullivan*, Justice William Brennan proclaimed on behalf of a

unanimous Supreme Court that "[w]hat a State may not constitutionally bring about by means of

a criminal statute is likewise beyond the civil law of libel."  376 U.S. 254, 277 (1964).  In that

landmark decision, the Supreme Court reversed a civil libel verdict rendered in favor of a

Montgomery, Alabama police commissioner against the *New York Times* and four prominent

civil rights leaders for an advertisement that criticized the city's harsh repression of peaceful

dissent by African-American clergymen in the segregated American South.  In so holding, the

Court made clear that actions brought pursuant to state defamation laws are severely limited by

the free speech and free press protections enshrined in the First Amendment.[3]  Specifically, the

Supreme Court held that misstatements of fact or unjustified opinions published by the media

---

[3]"[F]reedom of speech and of the press—which are protected by the first amendment from abridgement by Congress—are among the fundamental personal rights and 'liberties' protected by the due process clause of the fourteenth amendment from impairment by the states."  *Gitlow v. New York*, 268 U.S. 652, 666 (1925)).

about the conduct of public officials were deemed to be constitutionally privileged, unless the false or unjustified material was published with "actual malice," a concept defined as publication with actual knowledge of falsity or with reckless disregard of probable falsity. *New York Times*, 376 U.S. at 279-80.    Such constitutional protections are rooted in the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," even though "it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," *id.* at 270, and the recognition that "[t]he fear of damage awards . . . may be markedly more inhibiting than the fear of prosecution under a criminal statute." *Id.* at 277.

### *New York Times* rule extended to "public figures"

In *New York Times*, the Supreme Court expressly reserved the determination of "how far down into the ranks of government employees the 'public official' designation would extend for purposes of this rule, or otherwise to specify categories of persons who would or would not be included." *Id.* at 284 n.23.    Shortly thereafter, in *Curtis Publishing Co. v. Butts*, it extended application of the standard to public figures.  388 U.S. 130 (1967).  The term "public figure" includes those who are not public officials but nonetheless thrust themselves "into the 'vortex' of an important public controversy," as well as those who by status or position command a continuing public interest.  *Id.* at 154-55 (quoting *Whitney*, 274 U.S. at 377 (Brandeis, J., concurring)).  The Supreme Court later elaborated on the concept of public figures, indicating that some "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes.  More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues

involved.  In either event, they invite attention and comment."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 336 (1974)

### Heightened protection extended to matters of public concern

Importantly, protection from the punitive reach of state defamation laws is not strictly limited to circumstances involving public officials and public figures.  In *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 768-69 (1986), the Supreme Court addressed a situation involving a private-figure plaintiff who brought a suit for defamation resulting from speech addressing a matter of public concern.  The Supreme Court held that where speech involves matters of public concern, even where a private figure is involved, a plaintiff must meet the constitutional burden of demonstrating "falsity, as well as fault," to recover damages.  *See id.* at 776.  As the Court explained, "[i]n a case presenting a configuration of speech and plaintiff like the one we face here, and where the scales are in such an uncertain balance, we believe that the Constitution requires us to tip them in favor of protecting true speech."  *Id.* at 776.

### "Rhetorical hyperbole," "vigorous epithets," held not actionable

The Supreme Court has also placed substantial constitutional limits on the type of speech that may properly be the subject of state defamation actions.  In *Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6 (1970), the Supreme Court announced additional broad constitutional protection for "rhetorical hyperbole."  In *Bresler*, the complainant was a real estate developer attempting to secure zoning variances from the Greenbelt City Council.  As it happened, he also owned some land that the council was attempting to acquire for a school.  The local newspaper published reports characterizing the developer's negotiating position as "blackmail," and the developer sued for libel.  The Supreme Court squarely rejected the

developer's contention that such liability could be premised upon the notion that use of the word "blackmail" implied that he had committed the actual crime of blackmail, holding "that the imposition of liability on such as basis was constitutionally impermissible—that as a matter of constitutional law, the word 'blackmail' in these circumstances was not slander when spoken, and not libel when reported in the *Greenbelt News Review*."  *Id.* at 13.  As the Supreme Court explained:

> It is simply impossible to believe that a reader who reached the word "blackmail" in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense.  On the contrary, <u>even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable</u>.

*Id.* at 14 (emphasis supplied).  As a result, the Court held as a matter of law that "[t]o permit the infliction of financial liability upon the petitioners for publishing these two news articles would subvert the most fundamental meaning of a free press, protected by the First and Fourteenth Amendments."  *Id.*

### Use of term "Traitor" specifically held not actionable

In *Old Dominion Branch No. 496, National Ass'n of Letter Carriers, AFL CIO v. Austin*, 418 U.S. 264, 286-87 (1974), the Supreme Court expressly held that the use of the word "traitor" in a union organizing newsletter's definition of the word "scab" was not actionable.   The Supreme Court explained that in such a context, "<u>use of words like 'traitor' cannot be construed as representations of fact.</u>"  *Id.* at 284 (emphasis supplied).  Instead, as with the use of the pejorative term "blackmail" at issue in *Bresler*, the Supreme Court held that it was "<u>similarly</u>

impossible to believe" that anyone would have understood the newsletter "to be charging the appellees with committing the criminal offense of treason."  *Id.* at 285 (emphasis supplied). Rather, the Supreme Court determined that the term was "merely rhetorical hyperbole, a lusty imaginative expression of the contempt felt by union members towards those who refuse to join," and was "obviously used . . . in a loose, figurative sense to demonstrate the union's strong disagreement with the views of those workers who oppose unionization."  *Id.* at 284-86.

### Parody held not actionable

In *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988), the Supreme Court further held that the First Amendment precluded any recovery under state law for a parody, however inherently offensive to the individual it lampooned, that "could not reasonably have been interpreted as stating actual facts about the public figure involved."  In *Hustler*, a minister brought suit against a magazine for a parody of an advertisement appearing in the magazine that depicted his first sexual experience as a "drunken incestuous rendezvous with his mother in an outhouse."  *Id.* at 48.  As the Supreme Court explained, the *Hustler* ad parody portrays the minister and his mother as "drunk and immoral, and suggests that respondent is a hypocrite who preaches only when he is drunk."  *Id.*  In small print at the bottom of the page, the magazine included the phrase "ad parody—not to be taken seriously" and the parody was listed in the table of contents as "Fiction; Ad and Personality Parody."  *Id.*

Upon a review of past parodies and cartoons and their role in American political discourse, the Supreme Court observed that they are "often based on exploitation of unfortunate physical traits or politically embarrassing events—an exploitation often calculated to injure the

feelings of the subject of the portrayal," and "often not reasoned or evenhanded, but slashing and one-sided." *Id.* at 54. Nonetheless, the Court concluded that "[f]rom the viewpoint of history it is clear that our political discourse would have been considerably poorer without them." *Id.* at 55. The Supreme Court then upheld the lower court's finding that the "*Hustler* ad parody could not reasonably be understood as describing actual facts about [the minister] or actual events in which he participated" and that the "ad parody 'was not reasonably believable.'" *Id.* at 57 (quoting lower court holding). Since the parody constituted speech that "could not reasonably have been interpreted as stating actual facts about the public figure involved," the Supreme Court affirmed that it was absolutely protected by the First Amendment and no state law liability could be imposed. *Id.* at 50.

### *Milkovich v. Lorain Journal Co.*

In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990), the Supreme Court summarized and reaffirmed previously existing constitutional safeguards in the free speech arena, but declined to recognize "still another first amendment-based protection for defamatory statements that are categorized as 'opinion' as opposed to 'fact.'" *Id.* at 17. Instead, the Supreme Court emphasized that existing First Amendment principles sufficiently secured the "breathing space" that "freedoms of expression require in order to survive." *Id.* at 19 (quoting *Philadelphia Newspapers*, 475 U.S. at 772 and *New York Times*, 376 U.S. at 272).

The first of these principles is that "a statement of opinion relating to matters of public concern which does not contain a provably false connotation will receive full constitutional protection." *Milkovich*, 497 U.S. at 20; *see also Philadelphia Newspapers*, 475 U.S. at 772. Second, the First Amendment also provides full protection for "statements that cannot

'reasonably [be] interpreted as stating actual facts' about an individual." *Milkovich*, 497 U.S. at 20; *see also Bresler,* 398 U.S. at 14, *Letter Carriers,* 418 U.S. at 284, *Falwell*, 485 U.S. at 50. As the Supreme Court explained, "[t]his provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our nation." *Milkovich*, 497 U.S. at 20.  Third, "where a statement of 'opinion' on a matter of public concern reasonably implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth." *Milkovich*, 497 U.S. at 20.  Similarly, "where such a statement involves a private figure on a matter of public concern," a plaintiff must also show that the false connotations were made with some level of fault. *Id.* (citing *Gertz*, 418 U.S. at 323).

In sum, the Supreme Court's staunch and multi-layered defense of free speech set forth in *New York Times* and its progeny makes clear that even "vehement, caustic, and sometimes unpleasantly sharp attacks" are protected by the First Amendment. *New York Times*, 376 U.S. at 270.  Indeed, "even when a speaker or writer is motivated by hatred or ill will his expression [is] protected by the First Amendment." *Hustler*, 485 U.S. at 53 (citing *Garrison v. Louisiana*, 379 U.S. 64 (1964)).  "Freedoms of expression require 'breathing space,'" lest speakers be intimidated and public debate shrivel. *Philadelphia Newspapers*, 475 U.S. at 772 (quoting *New York Times*, 376 U.S. at 272).

**B.    The Defendants' political speech, expressed in the form of parody and specifically labeled as such, constitutes nothing more than "rhetorical hyperbole" that no reasonable reader could interpret as stating actual defamatory facts and is therefore absolutely protected by the First Amendment.**

In *Milkovich*, the Supreme Court analyzed statements in a newspaper column to

–14–

determine whether or not a reasonable factfinder could conclude that certain statements implied a believable assertion that Milkovich actually perjured himself in a judicial proceeding. 497 U.S. at 21. The Court also reaffirmed beyond constitutional quarrel that where "loose, figurative, hyperbolic language" or the "general tenor" of the speech in question "would negate the impression that the writer was seriously maintaining that petitioner committed the crime of perjury," the speech would be absolutely protected by the First Amendment. *See id.* This is so because no liability can ever be imposed for speech that "cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Id.* at 20 (quoting *Falwell*, 485 U.S. at 50).

The controlling question to be asked in the resolution of this motion, therefore, is whether reasonable readers would interpret Senator Abourezk's, Professor Dunbar-Ortiz's, and Jane Fonda's presence, included with the Dixie Chicks, Barbra Streisand, Whoopi Goldberg, Vice-President Gore, and approximately one hundred other celebrities, politicians, and public figures on the ProBush.com political website's tongue-in-cheek "Traitor List"—which is expressly labeled with the disclaimer "*Parody. Not to be taken seriously. These 'traitors' are not legal 'traitors' of the United States, although we wish they were" —as stating actual false and defamatory facts about the Plaintiff, or whether it instead constitutes political parody, a partisan "vigorous epithet," "imaginative expression," or "rhetorical hyperbole" that is absolutely protected by the First Amendment.

As revealed by the Supreme Court's analysis of the statements in *Milkovich*, when determining whether a statement alleged to be a defamatory falsehood purports to state or imply "actual facts about an individual," courts must scrutinize the type of language used, the meaning

of the statement in context, whether the statement is verifiable, and the broader social circumstances in which the statement was made.  497 U.S. at 21-22; *and see id.* at 24 (Brennan, J., dissenting).  In analyzing these factors, courts have been cognizant of the admonition by Justice Holmes that "[a] word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."  *Towne v. Eisner*, 245 U.S. 418, 425 (1918).

The ProBush.com website's "Traitor List™" employs identical language to that examined in *Letter Carriers*, which the Supreme Court has already expressly held to be non-actionable. 418 U.S. at 286-87.  As *Letter Carriers* explained, when employed as a mere figurative expression of vitriol, the "use of words like 'traitor' cannot be construed as representations of fact."  *Id.* at 284.  Rather, the use of such language on the ProBush.com website is "merely rhetorical hyperbole, a lusty imaginative expression of the contempt" conveyed on the website "towards those who refuse to" support President Bush and his decision to use military force in Iraq, and was "obviously used . . . in a loose, figurative sense to demonstrate" the website's "strong disagreement with the views of those . . . who oppose" the President's policies.  *Id.* at 284-86.  Just as with the use of the term "blackmail" in *Bresler*, 398 U.S. at 14, it is "impossible to believe" that anyone could understand the ProBush.com website "to be charging [Plaintiffs] with committing the criminal offense of treason."  *Letter Carriers*, 418 U.S. at 285.  Indeed, while the term "traitor" can be used to refer to someone who has committed the actual crime of treason against the United States, the more common dictionary definition of the term is "one who betrays another's trust or is false to an obligation or duty."  Webster's New Collegiate Dictionary at 1239 (G. & C. Merriam Co. 1976).  Clearly, the use of the term "traitor" on this particular

website is intended as figurative and vitriolic political criticism.  As the United States Court of Appeals for the First Circuit has explained:

> The First Amendment's shielding of figurative language reflects the reality that exaggeration and non-literal commentary have become an integral part of social discourse.  For better or worse, our society has long since passed the stage at which the use of the word "bastard" would occasion an investigation into the target's lineage or the cry "you pig" would prompt a probe for porcine pedigree.  Hyperbole is very much the coin of the modern realm.  In extending full constitutional protection to this category of speech, the *Milkovich* Court recognized the need to segregate casually used words, no matter how tastelessly couched, from fact-based accusation.

*Levinsky's Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 128-31 (1st Cir. 1997) (further explaining that "[c]ertain excesses of language cannot ground a defamation claim because in context those excesses involve only puffery or epithets, and thus are insufficiently fact-based," and "certain turns of phrase" such as "traitor" and "blackmail" are "recognized rhetorical devices" that "are not actionable because they are commonly understood, in context, as imaginative expressions rather than statements of fact") (emphasis in original removed); *see also Campbell v. Citizens For An Honest Government, Inc.*, 255 F.3d 560, 567-68 (8th Cir. 2001); *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1446-47 (8th Cir. 1989); *Lauderback v. American Broadcasting Companies, Inc.*, 741 F.2d 193, 195-97 (8th Cir. 1984).

This is doubly so where the language in question precisely defines what is intended by referring to the individuals appearing on the website as "Traitors."  At the top, the website clearly defines the term "Traitor" for purposes of its "Traitor List™" as: "<u>Traitor</u>: If you do not support our President's decisions you are a <u>traitor</u>."  This exceedingly loose definition of the term clearly signals to the reader that its usage is not literal in the sense of asserting that those appearing on the list are guilty of specific criminal conduct.  *See Dilworth v. Dudley*, 75 F.3d

–17–

307, 310 (7th Cir. 1996) (dismissing defamation on a 12(b)(6) motion where author defined term "crank").  No reasonable person could understand such a definition as actually contending as a factual matter that every person in the United States who disagrees with decisions made by President Bush is guilty of committing the criminal offense of treason.

Nowhere, moreover, does the website state that the persons appearing on the "Traitor List™" are actually guilty of committing any crime.  To the contrary, as acknowledged in the Plaintiff's complaint, the website expressly states that it is a "*Parody.  Not to be taken seriously.  These 'traitors' are not legal 'traitors' of the United States, though we wish they were."  In sum, as a matter of constitutional law, the actual language used on the ProBush.com website, even when completely divorced from its surrounding context, does not state an actionable claim for defamation.

When one proceeds to examine the context of the Plaintiffs' inclusion on the ProBush.com website's "Traitor List™," it becomes even more apparent that no one could reasonably interpret the website as stating actual false and defamatory facts about the Plaintiffs, rather than  political criticism in the form of "rhetorical hyperbole."  First, the website itself is clearly and expressly identified as a method of expressing political commentary.  The name of the website itself is "ProBush.com."  No reasonable person could pull up a "ProBush.com" website that sells "ProBush.com Gear!" and features a "ProBush.com Poster Store!" and not understand that he or she was being subjected to a partisan and political viewpoint in support of President Bush and against those who oppose or criticize him.  Second, it is manifestly apparent that the website's allegedly trade-marked "Patriot List™" and "Traitor List™" are simply intended to identify public figures who either share its uncritical support of President Bush and

his policies or pointedly and publicly do not.  Third, the inclusion of the Plaintiffs' names within a list of more than one hundred movie stars, famous musicians, and politicians reveals to any potential reader that the "Traitor List™" is not an actual list of criminals.  No person could view the "Traitor List™" and reasonably conclude that Barbra Streisand, Whoopi Goldberg, Madonna, Casey Kasem, the Dixie Chicks, President Carter, Vice-President Gore, Senator Kennedy, Senator Clinton, Senator Abourezk, Jane Fonda, and Professor Dunbar-Ortiz are all persons who are guilty of committing the actual crime of treason against the United States.  Indeed, some of the celebrity photographs have jokes or satirical comments appearing next to them.   Next to Oliver Stone, the caption "How about another conspiracy theory" appears.  Next to the actor Mike Farrell, the website advises, "Stick to your MASH unit, B.J."   To Martin Sheen's photograph is ascribed the admonition, "You just play a president on TV so stop acting like one."  Sean Penn's portrait elicits the comment, "Dude! Are you as stupid as you look!"

The viewer also receives a verbal signal as to the figurative nature of the term "traitor" upon hearing the audio clip, "You're the Traitor," from the Hollywood film "Man in the Iron Mask," immediately upon opening the list.  And again, the context is specifically identified on the website itself as being a "*Parody" that is "Not to be taken seriously," with the express admonishment that "These 'traitors' are not legal 'traitors' of the United States, though we wish they were."  Viewed in context, it corrupts all notions of common sense to suggest that anyone could reasonably interpret the ProBush.com website's list of celebrities and public figures as constituting a literal criminal indictment of, rather than a partisan political attack upon, those celebrities and public figures.

Moreover, the "statement" at issue, which takes the form of the Plaintiffs' inclusion on

the ProBush.com website's celebrity "Traitor List™," contains a specific definition of "traitor" as someone who does not support the President and his decisions:   "Traitor: If you do not support our President's decisions you are a traitor."   This does not constitute an assertion of objective fact, but rather a generic and unverifiable *ad hominem* broadly directed at a large group of famous individuals, including Senator Abourezk, Professor Dunbar-Ortiz, and Ms. Fonda, who have generally expressed public criticism of President Bush and his decision to authorize military action in Iraq.   Such an assertion does not qualify as a form of verifiable, literal falsehood that could lead anyone to believe that the website was stating a concrete, objective fact about the Plaintiff in this case.   *See Secrist v. Harkin*, 874 F.2d 1244, 1251 (8th Cir. 1989) (holding that implications regarding appointment of Marine officer to Senator's staff enhancing campaign contributions from defense contractors were, in context, "not so precise, specific, or verifiable that they can be equated—as Secrist alleges—as akin to an accusation of criminal conduct"); *McCabe v. Rattiner*, 814 F.2d 839, 842-43 (1st Cir. 1987) (holding that newspaper headline that referred to plaintiff's real estate development as a "scam" was not actionable because the word means different things to different people and "[t]he lack of precision makes the assertion 'X is a scam' incapable of being proven true of false"); *Fudge v. Penthouse*, 840 F.2d 1012, 1017 (1st Cir. 1988) (rejecting a defamation claim brought by four pre-teen girls based on a headline depicting them as "amazons" because such language constitutes "no more than rhetorical hyperbole," and the "average reader understands that the headline is the editors' ironic comment. . ., rather than a literal representation").   The general tenor of the website, which is clearly satirical and political, further serves to emphasize that the "Traitor List™" is a parody, or political and satirical "expression of contempt," that is incapable of being proven false and

does not constitute a serious statement of fact.

Finally, the broader social circumstances in which the "Traitor List™" appears clearly demonstrate that it does not constitute an actual and believable accusation of criminal conduct. It is plain from the website that it is intended to inject a particular viewpoint into the stream of political discourse regarding President Bush's decision to authorize war with Iraq. The "social context" of the "Traitor List" is therefore the often tumultuous public debate over war and peace, a subject that is supremely contentious and subject to heated discussion and debate.

Numerous courts have applied governing Supreme Court precedent to circumstances very similar to those in the present case and granted a defendant's motion to dismiss for failure to state a claim. Many of those cases have involved parody or "rhetorical hyperbole" as appears on the ProBush.com website. For example, in *Evel Knievel v. ESPN, Inc*., 223 F. Supp. 2d 1173, 1175 (2002), the ESPN.com website had posted a "Green Carpet Gallery" consisting of photographs of celebrities who had attended the ESPN Action Sports and Music Awards. Included within the gallery was a picture of the former motorcycle daredevil and his wife with the caption, "Evel Knievel proves that you're never too old to be a pimp." *Id*. at 1176. Knievel filed a claim for defamation against the owner of the website, claiming that ESPN was actually alleging that he was a pimp and his wife a prostitute: "Plaintiffs counter that use of the word 'pimp' charges Evel Knievel with a criminal offense. Plaintiffs also assert that by implication, Krystal Knievel is being accused of being a prostitute. Plaintiffs argue that the caption is not humorous, bears a defamatory meaning, constitutes libel per se, and is actionable on its face." *Id.* at 1179.

ESPN brought a motion to dismiss, contending that "no reasonable person would believe

–21–

the caption underneath the picture of Evel Knievel was alleging that Evel Knievel [was] actually

a pimp or that Krystal Knievel [was] involved in prostitution." *Id.* The district court agreed, and

granted the motion to dismiss, concluding that "[t]he website was obviously directed at a

younger audience and contained loose, figurative, slang language such that a reasonable person

would not believe ESPN was actually accusing Plaintiffs of being involved in criminal activity."

*Id.* The court noted that the "general tone of the ESPN.com website and the Green Carpet

Gallery was one of tongue-in-cheek humor and slang that was not meant to be taken seriously"

and that a reasonable person "would understand that pimp is being used in a figurative sense."

*Id*. at 1180. As the court further explained:

> Plaintiffs seek to justify their cause of action by prescribing the meaning they
> wish to the term "pimp." This is not the standard by which a libel action is
> measured. If it were, a defamation action would lie any time a person was
> offended by a term that could have a negative meaning. That a term is capable of
> having a defamatory meaning, it does not necessarily follow that the meaning is
> reasonable when considered in the context in which it was uttered.

*Id.* at 1181. The court also considered the context of the statement, specifically noting that "a

viewer had to click through numerous other pictures" on the website, circumstances directly

applicable to the present case, where Plaintiff's picture appears among numerous other

Hollywood celebrities and politicians. *Id.* As a result, the district court held that "[b]ecause a

reasonable person would not believe the caption under the photo of the Plaintiffs was accusing

Evel Knievel of being a pimp in the criminal sense, Plaintiff Evel Knievel's claims against ESPN

must be dismissed." *Id.* at 1182-83.4

---

4 *See also Cochran v. NYP Holdings, Inc.*, 58 F.Supp. 2d 1113 (C.D. Cal. 1998), *aff'd*, 210 F.3d 1036 (9th Cir.
2000); *Dworkin v. L.F.P., Inc.*, 839 P.2d 903, 915 (Wy. 1992); *Horsley v. Rivera*, 292 F.3d 695, 701-03 (11th Cir.
2002); *Weyrich v. The New Republic, Inc.*, 235 F.3d 617, 624-25 (D.D.C. 2001); *Buckley v. Littell*, 539 F.2d 882,
893-94 (2d Cir. 1976), *cert. denied*, 429 U.S. 1062 (1977) (holding that use of term "fascist" to describe author
William F. Buckley could not be regarded as verifiable statement of fact in defamation action); *Ollman*, 750 F.2d at
986 (holding that statements set forth in syndicated newspaper column that professor was "Marxist" were entitled to

**C.    The Plaintiffs, who are public figures that have thrust themselves into the forefront of a national controversy and have been subjected to responsive criticism regarding a matter of public concern, cannot satisfy the standards of actual malice or falsity as well as fault.**

In *Curtis Publishing Co. v. Butts*, the Supreme Court extended application of the "actual malice" standard to public figures.  388 U.S. 130 (1967).  The term "public figure" includes those who are not public officials but nonetheless thrust themselves "into the 'vortex' of an important public controversy," as well as those who by status or position command a continuing public interest.  *Id.* at 154-55 (quoting *Whitney*, 274 U.S. at 377 (Brandeis, J., concurring)).  The Supreme Court later elaborated on the concept of public figures, indicating that some "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes.   More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.  In either event, they invite attention and comment."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 336 (1974).   In *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 768-69 (1986), the Supreme Court addressed a situation involving a private-figure plaintiff who brought a suit for defamation resulting from speech addressing a matter of public concern.  The Supreme Court held that where speech involves matters of public concern, even where a private figure is involved, a plaintiff must meet the constitutional burden of demonstrating "falsity, as well as fault," to recover damages.   *See id.* at 776.  As the Court explained, "[i]n a case presenting a configuration of speech and plaintiff like the one we face here, and where the scales are in such an uncertain balance, we believe that the Constitution requires us to tip them in favor of

absolute First Amendment protection); *Gold v. Harrison*, 962 P.2d 353, 361-62 (Haw. 1998) (holding that artist's statement "I'm being raped by all these people," was constitutionally protected rhetorical hyperbole and affirming Rule 11 sanctions against attorney for filing frivolous complaint); *Yeagle v. Collegiate Times*, 497 S.E.2d 136, 137-

protecting true speech." *Id.* at 776.

As set forth above, there is little doubt that Senator Abourezk, Professor Dunbar-Ortiz, and Jane Fonda are public figures who have thrust themselves to the forefront of numerous national issues, including opposition to the Iraq war, particularly through their joining of the "Not in Our Name" Petition and campaign promoted worldwide. In addition, the speech in question is clearly related to a matter of public concern; indeed, perhaps one of the greatest matters of public concern in the past several decades: the decision of the United States government to invade Iraq and differing viewpoints over the proper role of United States citizens in supporting or opposing that decision. *See Hepps*, 475 U.S. at 775. The constitutional standards of either "actual malice," for public figures, or "falsity, as well as fault," simply cannot be met in this case. As the Supreme Court has stated, "[t]he phrase 'actual malice' is unfortunately confusing in that it has nothing to do wit bad motive or ill will." *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989). The names of the Plaintiffs were included on the Defendants' political website in order to comment, however indelicately, on the political dialogue surrounding the decision to go to war and the duty, as the Defendants viewed it, to support the President's decision. By adding their vigorous opinions and public voice to those citizens who opposed the war in Iraq, the movement which prompted the Defendant's creation of the website in question, Plaintiffs joined a long list of celebrities, writers, and politicians who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 336. The Defendants were just as entitled under the First Amendment to express their disagreement

---

39 (Va. 1998); *Sanders v. Smitherman*, 776 So.2d 68, 73-75 (Ala. 2000); *Pullum v. Johnson*, 647 So.2d 254, 257 (Fla. Ct. App. 1994).

with and criticism of the Plaintiffs' views.  There is simply no evidence of "actual malice" or "falsity, as well as fault," that would support a verdict in favor of the Plaintiffs on a claim for defamation.  The First Amendment provides protection for the Defendants' speech in these circumstances.  As a result, on First Amendment grounds, summary judgment should be granted on Plaintiffs' claims.

## CONCLUSION

WHEREFORE, Defendant ProBush.com, Inc. respectfully requests that this Honorable Court grant its Motion to Dismiss.

Dated this 1st day of July, 2005.

JOHNSON, HEIDEPRIEM, MINER, MARLOW & JANKLOW, L.L.P.

BY /S/ RONALD A. PARSONS, JR.
Ronald A. Parsons, Jr.
Kimberly J. Lanham
P.O. Box 1107
Sioux Falls, SD 57101-1107
(605) 338-4304

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of **Defendant's Brief in Support of Motion for Summary Judgment** was served electronically on:

> Todd D. Epp
> ABOUREZK LAW OFFICES, P.C.
> P.O. Box 1164
> Sioux Falls, SD 57101-1164
>
> *Attorneys for the Plaintiffs*

on this 1st day of July, 2005.

/S/ Ronald A. Parsons, Jr.
Ronald A. Parsons, Jr.