es G. Abourezk

Page 5

## STIPULATION

It is stipulated and agreed by and between
the above-named parties, through their
attorneys of record, whose appearances have
been hereinabove noted, that the deposition of
James G. Abourezk may be taken at this time and
place, that is, at the offices of Johnson,
Heidepriem, Miner, Marlow & Janklow, Sioux
Falls, South Dakota, on the 18th day of
January, 2005, commencing at the hour of 3:00
o'clock p.m.; said deposition taken before Jill
M. Connelly, Notary Public within and for the
State of South Dakota; said deposition taken
for the purpose of discovery or for use at
trial or for each of said purposes, and said
deposition is taken in accordance with the
applicable Rules of Civil Procedure as if taken
pursuant to written notice.

         JAMES ABOUREZK,
called as a witness, being first duly sworn,
testified as follows:
EXAMINATION BY MR. PARSONS:
Q. Would you state your name, please?
A. James Abourezk.
Q. Senator Abourezk, is it okay if I call you Jim?

Page 6

1 A. That's better, yes.
2 Q. Why don't you tell me how you first became
3    aware of the ProBush.com website.
4 A. I think somebody out in New England sent me an
5    e-mail, somebody I knew out there. I'm trying
6    to remember exactly who it was. I think it was
7    a guy from New Hampshire who told me about it,
8    but my memory is not that good on exactly who
9    told me.
10 Q. Did you then personally go and look at the
11    website?
12 A. I did.
13 Q. Tell me if you recall what you saw.
14 A. Well, I saw a list and photographs of people
15    who were defined as traitors to the United
16    States.
17 Q. Did you see your own name on there?
18 A. I did.
19 Q. Did you see the names of other celebrities?
20 A. When you say "other celebrities," you're
21    assuming I'm one?
22 Q. Or public figures or prominent people.
23 A. Yes, I did.
24 Q. What was your reaction to the website when you
25    saw it?

Page 7

1 A. Well, I was angered, outraged, surprised.
2 Q. And tell me why.
3 A. I guess it's not my place to ask questions, but
4    I would just ask you, how would you feel if
5    somebody called you a traitor of the United
6    States? That's the real answer.
7 Q. Did you understand the website to be asserting
8    that you had committed treason against the
9    United States Government?
10 A. Well, I understood the website to have called
11    me a traitor to the United States Government,
12    yes, the United States. That's what I
13    understood.
14 Q. When you saw the website, did you believe that
15    all of the people listed on the Traitor List
16    were being labeled as traitors to the United
17    States?
18 A. I understood that, yes.
19 Q. Did you believe it was true that they were?
20 A. I didn't believe any of them were traitors, to
21    my knowledge.
22 Q. Did you construe any political commentary in
23    the website? I mean did you view it all as
24    political commentary?
25 A. Well, I viewed some of it as political



Page 8

1    commentary, some of it as hawking products,
2    like Bush dolls or some things like that.
3 Q. What about the Traitor List itself? Did you
4    consider that at all to be a political
5    statement by the website?
6 A. I considered it to be an allegation, a charge
7    that I was a traitor to the United States.
8    That's what I considered it to be.
9 Q. When you went on the website, did you see the
10    disclaimer?
11 A. I did not. Only much later when I checked it
12    again, much later.
13 Q. Do you remember when it was that you first saw
14    the website time wise?
15 A. I can't give you the exact time. I think it
16    was April of whatever year it was. What year
17    was that? Do you remember?
18 Q. 2002.
19 A. Yes.
20 Q. I think that's right. In I think late April of
21    2002 your attorney, Mr. Epp, wrote some letters
22    to ProBush.com, I think an e-mail, and maybe a
23    letter in May, that referred to the
24    disclaimer. So would it be fair to say that
25    you had at least seen the disclaimer by that



Exhibit 11

**mes G. Abourezk**

Page 17

```
1   in an attorney-client situation, and we have
2   made an objection that it's attorney-client
3   privileged communication.  So you can keep
4   asking.  He'll give you the same answer.  Or we
5   can move on and discuss how we want to handle
6   these objections following the deposition.
7 Q. Exhibit 2 is your affidavit?
8 A. Yes.
9 Q. Paragraph 3, and this is your signed
0   statement.
1 A. Yes.
2 Q. Paragraph 3 says, "I have never been accused
3   of, charged with, or convicted of the crime of
4   treason by any state or by the United States of
5   America."  That's true?
16 A. Yes.
17 Q. Obviously.  Do you believe that ProBush.com has
18   accused you, charged you with, or convicted you
19   of the crime of treason?
20 A. They've charged me with being a traitor, which
21   is a crime of treason, yes.
22 Q. The next one is your attorney's Affidavit.  It
23   states, Paragraph 3, "On or about April 22,
24   2003, I became aware of the ProBush.com website
25   from my client, James G. Abourezk."  That would
```

Page 19

```
1   issues?
2 A. I'm an activist on a lot of issues, some
3   important, some not.
4 Q. You've never been one to shy away from
5   publicity?
6 A. I'm very modest sometimes.  Sometimes I'm not.
7 Q. At least you've never been afraid to give your
8   opinion when you think it's important.
9 A. That's true, yes.
10 Q. Would you agree you kind of have a place in
11   society where you have a bully pulpit that not
12   everyone, not every average American may have?
13 A. I don't know.  I can't really answer that yes
14   or no.
15 Q. Let's take a look at the website here.  Exhibit
16   4 is what I believe what you would see, at
17   least as of the date this was printed, the
18   opening page of the website.
19       When you saw it, did you see this page or
20   something like it, or did you go straight to
21   the Traitor List?  Did you click through some
22   things, or do you remember?
23 A. You know, I really don't recall to answer
24   that.  I eventually got to the Traitor List,
25   but I don't know what I did before that.
```

Page 18

```
1   be approximately when you discovered the
2   website, or would that refresh your
3   recollection as to that?
4 A. I believe I discovered it before this date, but
5   then I discussed it with my attorney at some
6   point after.  I don't know if this is a correct
7   date or not.
8 Q. It states that, "Senator Abourezk as well as a
9   number of other prominent Americans were listed
10   on the site's Traitor List."  Would you agree
11   you are a prominent American?
12 A. Well, I don't think that's for me to say.
13   That's a judgment for other people.
14 Q. Do you have any opinion on whether or not
15   you're a prominent American?
16 A. I don't.
17 Q. Do you dispute that you are a public figure?
18 A. Well --
19      MR. EPP:  Objection, calls for a legal
20   conclusion.
21 A. I neither admit or dispute it.  That's a legal
22   conclusion I can't make.
23 Q. Do you believe you're famous?
24 A. I don't think I'm famous, no.
25 Q. Do you believe you are an activist on important
```

Page 20

```
1      MR. EPP:  Ron, in asserting this, this is
2   what you believe Senator Abourezk saw the first
3   time he viewed the site?
4      MR. PARSON:  No.
5      MR. EPP:  The date stamp, at least when
6   this was printed out, apparently is June 27,
7   2003, and there's a mention on the first page
8   to donate to ProBush.com's legal battle.
9   Apparently part of it's concerning James
10   Abourezk.  So this would come sometime, I'm
11   assuming sometime after the first publication
12   of the website?
13      MR. PARSON:  That's correct, yes.  Not
14   asserting that this is definitely and obviously
15   not exactly what was there when he first saw
16   it, although some of this is kind of permanent
17   content that may have been very similar in
18   structure.
19 Q. The next one is what's called the Patriot
20   List.
21 A. Is that No. 5?
22 Q. No. 5, Exhibit 5.  Do you remember looking
23   through this?
24 A. You know, I don't remember seeing this ever.  I
25   see Bill O'Reilly and Ann Coulter on it and
```

Page 35

the Middle East in the center of this entire
important issue.  Is that a fair statement?

A. Well, I'm not a kid.  I'm 73 years old.

Q. But grew up in South Dakota.

A. I did.

Q. Meaning it's impressive that -- what I'm trying
to establish is you are having a major affect
on world events from South Dakota.

A. Well, I don't know how to answer that.

Q. Would you agree that you had an affect on world
events?

A. Well, if, indeed, it was my work that got the
Iraqis to let the weapons inspectors in, which
did absolutely no good, anyhow, I guess but
that's what happened.  That's all I can say
about it.

Q. It depends on one's point of view whether it
did any good, I guess.

A. It didn't do any good.  It didn't prevent the
invasion.

Q. It didn't prevent the invasion.  What did they
tell you about weapons of mass destruction when
you were there?

A. Said they didn't have any.  I guess he was
right, too.

1   Middle East?
2 A. Yes.
3 Q. Do you speak with them regularly?
4 A. Not regularly.
5 Q. I've been to your office.  I don't know if you
6   remember, when I was in law school I did some
7   legal research for you.
8 A. You did some research for me, yes.
9 Q. So I've been to your office, and I remember all
10   the photographs on the wall, you with all the
11   important leaders.
12 A. Including Mohammed Ali.
13 Q. Mohammed Ali was the good one, the best one.  I
14   know you're not going to answer the question of
15   whether or not you are a public figure, but is
16   it safe to say that you are someone who rubs
17   elbows with some of the most important figures
18   of our time?
19 A. I don't think that's safe to say, no.
20 Q. You would disagree with that?
21 A. Well, yeah.  Whether people I meet with are
22   important or not, I don't know.  That's open to
23   discussion.
24 Q. Did you view the ProBush.com website calling
25   you a traitor or putting you on the Traitor

Page 34

Q. Who went with you to Iraq?  I saw Congressman
Rahall.

A. Yes.

Q. He was a sitting Congressman?

A. From West Virginia, yes.

Q. Who else?

A. Warren Strobel from Knight-Ridder.

Q. Journalist?

A. He was a journalist.  There were several
journalists.  There was somebody from National
Public Radio.  I can't remember the guy's
name.  Let's see, Norman Solomon from the
Institute for Public Accuracy.

Q. I think I read something about him.

A. There are probably a couple others, but I can't
remember.

Q. Where else?  Did you just go to Baghdad?  Did
you go to other governments?

A. We stopped in Damascus both ways.

Q. What did you do there?

A. I can't remember if I met with the President of
Syria or not.  I can't remember that now.  I've
met with him a number of times.  It's possible
I did.

Q. Is it true you know many of the leaders in the

Page 36

1   List as impugning your patriotism?
2 A. Oh, yes.
3 Q. Is it a crime to impugn somebody's patriotism?
4 A. If you call them a traitor, if you accuse them
5   of a crime, yes, that's wrong.  I was accused
6   of a crime.
7 Q. I'm looking at Exhibit 9, the second page.  Is
8   this an article you authored?
9 A. Yes.
10 Q. I'm sorry, the third page.
11 A. There's nothing in the third page.
12 Q. No, second page.  I'm sorry.  The last
13   paragraph says, "The question of patriotism
14   should not be aimed at those who oppose the
15   aggressive devastation of a small Third World
16   country, but at those in the Bush
17   administration who seem to delight in the
18   prospect of the annihilation of innocent Iraqi
19   civilians."
20       Are you impugning the patriotism of people
21   in the Bush administration?
22 A. No, I'm not actually.  I'm impugning their
23   motives, which I think are very bad motives.
24       Incidently, I said, "Their plan will
25   devastate our own economy."  I guess I was

Page 53

1 A. Oh, yes.
2 Q. So couldn't you figuratively call him a
3    traitor?
4 A. But he wasn't a traitor to his country.
5 Q. Not to his country, but couldn't you
6    figuratively call him a traitor for doing that?
7 A. But not to his country.  The answer is no.  My
8    answer is no to that question.
9 Q. Do you believe that your criticism of the
10   administration regarding its Iraq policy and
11   ProBush.com's statements on its websites to
12   criticize you, do you believe they affect
13   matters of public concern and policy?
14 A. I don't know.  I don't know the answer to
15   that.  It's not for me to say.
16 Q. Have you visited any doctors or mental health
17   professionals to deal with any problems caused
18   by these statements on the ProBush.com website?
19 A. I won't answer that question.
20 Q. I'm entitled to know that.  Are you claiming
21   any type of emotional, physical injury?
22 A. Don't need to talk about damages.
23 Q. I'm entitled to get into damages, if you're
24   claiming damages.
25 A. I'm refusing to answer.

Page 54

1       MR. PARSON: If I can ask your attorney.
2   Are you claiming?  I haven't seen it in your
3   Complaint.  My assumption is you're not
4   claiming any physical, emotional injuries
5   resulting from this.
6       MR. EPP: We have not put Senator
7   Abourezk's mental state into issue, mental
8   condition, if you will.
9       MR. PARSON: Or emotional injury.  True?
10      THE WITNESS: Not required to.
11      MR. EPP: Not required to.  It's up to a
12  jury to determine.
13      MR. PARSON: Just verifying, though, that
14  your claim is based on a libel per se claim and
15  not emotional, physical damages.
16      MR. EPP: I guess I answered that we have
17  not disclosed a medical expert at this time or
18  counseling expert.
19 Q. Do you have any documentary evidence, I'm just
20   asking, that demonstrates the statements in the
21   ProBush.com website are factually false as
22   opposed to merely being opinions or insults?
23 A. I don't have an answer to that question.
24 Q. You're not aware of any documentary evidence?
25 A. I don't have an answer to that question.

Page 55

1       MR. EPP: Let me clarify.  What kind of
2    things are you talking about?
3 Q. I'm assuming, I don't know what there would
4    be.  I mean do you have any evidence -- do you
5    have any documents of any kind, and I don't
6    know what they would be, that demonstrate that
7    his statements on the ProBush.com website are
8    factual falsities rather than just mere insults
9    or opinion?
10 A. I'll answer that part.  I didn't understand
11   your question at first.  Calling me a traitor
12   is factually false.
13 Q. Do you have any documents or -- I understand no
14   one -- I want to make this clear.  No one is
15   contending that you are a legal traitor to the
16   United States Government or have committed any
17   crime whatsoever.  That's our position.
18      But do you have any documents, and I'm
19   guessing you don't but I'm wondering, that
20   demonstrate that what's on the ProBush.com
21   website is factually false as opposed to being
22   merely an insult?
23 A. Well, I would say there's an absence of
24   documents proving the truth of their
25   statement.  I'm not, never been accused of

Page 56

1    being a traitor formally.  I've never been
2    charged with it, never been tried or
3    convicted.
4 Q. Did you ever, prior to seeing this website, did
5    you have any idea who the Marino brothers were?
6 A. No.
7 Q. Absolutely no conversations with them?
8 A. No.
9 Q. Do you know anything about them at all, other
10   than what you read in this lawsuit?
11 A. No.
12 Q. Do you know why you were placed on the website?
13 A. I don't know.
14 Q. Do you know whether or not they knew who you
15   were when you were placed on the website?
16 A. I don't know.  I assume they must have known or
17   wouldn't have put my name on there.  That's an
18   assumption.  That's all I can say.
19      MR. PARSON: I think I'm entitled to know
20   what your damages calculations are, if any.  If
21   it's -- a libel per se is a calculation of
22   damage.  That's what your Complaint states, and
23   if that's what it is, then I accept that and I
24   don't need to go any further.  But if you are
25   claiming individualized damages, I'm entitled